**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No. 1:22-mc-00248-JMF |
| Applicant, | |
| -against- | |
| CURTIS WAYNE CRONIN and JOHN JOSEPH, | |
| Respondents. | |

**RESPONDENTS' MEMORANDUM OF LAW IN OPPOSITION TO THE**
**SECURITIES AND EXCHANGE COMMISSION'S ORDER TO SHOW CAUSE**

**FOX ROTHSCHILD LLP**

Ernest Edward Badway, Esq.
Philip Z. Langer, Esq.
101 Park Avenue, 17th Floor
New York, New York 10178
Telephone: 212-878-7986
Facsimile: 212-692-0940
E-Mail: EBadway@foxrothschild.com

*Attorneys for respondents Curtis*
*Wayne Cronin and John Joseph*

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................. 1

FACTUAL BACKGROUND ................................................................................. 3

    A.    September 2020 to March 2022: The Original Staff Inquiry ................................. 3

    B.    March 2022: The Staff's Desperate Shift in Inquiry Focus ................................. 5

    C.    The July 2022 Subpoenas ................................................................ 6

LEGAL ARGUMENT ................................................................................... 9

    POINT I.    STANDARD OF REVIEW ........................................................... 9

    POINT II.    THE SUBPOENAS ARE UNREASONABLE, IN BAD FAITH, AND
              FOR AN IMPROPER PURPOSE ............................................... 10

      A.    The Staff Has Known Since July 2021 That the SEC Matter Was Not
          Disclosed and Is Serving the July 2022 Subpoenas to Extend What
          Should Be a Closed Inquiry ............................................... 11

      B.    The Due Diligence Questionnaires Did Not Inquire As to an SEC
          Inquiry ................................................................ 12

      C.    SEC Matters Need Not Be Disclosed ....................................... 12

      D.    Other Indicia of the SEC's Bad Faith and Improper Motives in this
          Matter ................................................................ 16

      E.    The July 2022 Subpoenas Are Duplicative of the Prior Subpoenas ........... 16

CONCLUSION .................................................................................... 23

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re BioScrip, Inc. Sec. Litig.*,
  95 F. Supp. 3d 711 (S.D.N.Y. 2015) ................................................................. 6, 15

*Gruber v. Gilbertson*,
  2018 WL 1418188 (S.D.N.Y. Mar. 20, 2018) ....................................................... 15

*Illinois Citizens Comm. for Broad. v. F.C.C.*,
  515 F.2d 397 (D.C. Cir. 1974) ............................................................................. 14

*In re Lions Gate Entertainment Corp. Sec. Litig.*,
  165 F. Supp. 3d 1 (S.D.N.Y. 2016) ...................................................................... 14

*Porrazzo v. United States Sec. & Exch. Comm'n*,
  2018 WL 1598655 (D. Haw. Apr. 2, 2018) ........................................................... 14

*RNR Enterprises, Inc. v. S.E.C.*,
  122 F.3d 93 (2d Cir. 1997) ................................................................................... 10

*Sec. & Exch. Comm'n v. Brigadoon Scotch Distrib. Co.*,
  480 F.2d 1047 (2d Cir. 1973) ............................................................................... 10

*United States Sec. & Exch. Comm'n v. Collector's Coffee Inc.*,
  337 F.R.D. 70 (S.D.N.Y. 2020) ............................................................................ 14

*United States v. Morton Salt Co.*,
  338 U.S. 632 (1950) ............................................................................................. 10

*United States v. Powell*,
  379 U.S. 48 (1964) ............................................................................................... 10

*Wells v. S.E.C.*,
  113 F.3d 1230 (S.D.N.Y 1997) ............................................................................ 13

*In re XP Inc. Sec. Litig.*,
  524 F. Supp. 3d 23 (E.D.N.Y. 2021) ................................................................... 15

*In the Matter of ZPR Investment Mgmt., Inc. et al.*,
  Admin. Proc. File No. 3-15263, Release No. 4249 (Oct. 30, 2015) ................... 6, 15

**Other Authorities**

*SEC Enforcement Manual*, Section 3.3.2 ................................................................ 12, 13

*SEC Enforcement Manual*, Section 3.3.5.1 ................................................................... 14

## PRELIMINARY STATEMENT

Respondents Curtis Wayne Cronin ("Cronin") and John Joseph ("Joseph," and with Cronin, collectively, the "Respondents" or "Principals") submit this Memorandum of Law in opposition to the Securities and Exchange Commission's ("SEC" or "Commission") subpoena enforcement action filed on September 1, 2022, seeking relief by way of an Order to Show Cause, dated September 2, 2022 ("OSC").

Initially, the Principals along with others have built Broadway Strategic Return Fund ("Fund") to support the theater arts, as well as trying to professionalize and support a vital asset of New York City and State. However, the Fund and its Principals have been ruthlessly targeted because the arts as a business is simply something the SEC does not understand. Moreover, the conduct of the SEC and its Staff is in stark contrast to one of the hallmarks of the SEC's investigative process. That is, the SEC's investigative process is shrouded in secrecy, and the SEC explicitly *refuses to identify those under investigation or if there is an investigation at all*, resulting in only SEC staff having any knowledge of those under investigation, leaving companies, senior management, and employees as well as outside counsel, typically, unaware of any SEC active investigation.

As evidence of this inflexible fact, for the last two years, the SEC has been requesting documents and information from the Fund, where Respondents are among the Principals. The Fund and Respondents have fully complied with the SEC's multiple, broad, non-specific, and often redundant requests for documents, information, and disclosures. The Fund and Respondents have already searched both their paper and electronic files on multiple occasions; produced more than 800,000 pages of documents; and sat for testimony where the SEC exhaustively questioned Mr. Cronin about the Fund's operations, valuations, investors, as well

as, most importantly, the Fund's disclosures to the investing public. Nonetheless, at no time during this process has the SEC or its Staff indicated that anyone or entity was under investigation, relying upon its long-standing refrain of having no targets or subjects.

Moreover, during the entirety of these efforts, the SEC Staff maintained that it was conducting an inquiry concerning the Fund's *valuation*, stating this fact as late as December 2021. However, there is no evidence there is anything wrong with the Fund's valuations. In fact, none of the Fund's audits have ever been withdrawn, and the former auditor even provided a clean SAS 114/115 letter.

However, after scrutinizing the Fund for more than two years, since the SEC Staff could find nothing wrong concerning the Fund's valuation policies, procedures or how the Fund presents itself to the investing public, the SEC Staff shifted its inquiry to the Fund's disclosure of the SEC's confidential, non-public inquiry to its investors in an attempt to trap the Fund and its Principals. That is, despite having all the information necessary to reach a conclusion for now over a year, rather than close its inquiry, the SEC decided in March 2022, to switch gears and consider the Fund's supposed "disclosure" of the SEC's inquiry itself.

Namely, in March 2022, the SEC suddenly stated it now believed the Fund wrongfully failed to disclose its confidential, non-public inquiry to investors. The SEC inexplicably changed course in two ways. Initially, during the entirety of the SEC inquiry, prior to March 2022, the SEC Staff maintained that the inquiry was about the Fund's valuation. Later, from the initial contact through the SEC's filing of this action, the Fund, its Principals, and its counsel have repeatedly asked the SEC if they were under investigation, or if they were targets or subjects of any investigation. Repeatedly, the SEC Staff indicated that it does not conduct investigations, it conducts fact-finding inquiries with no subjects or targets. The SEC Staff

informed Respondents and counsel that they have made no determinations that anyone has done anything wrong. The SEC has repeatedly, in response to inquiries, said it has made no judgments.

Nonetheless, in contrast to its statements to Respondents and counsel, the SEC insists, without any legal basis whatsoever, that its inquiry should have been disclosed to investors. However, the SEC has no legal or factual basis to insist upon the Fund's disclosure of the SEC's confidential, non-public inquiry in the Fund's private due diligence questionnaires. Therefore, these July 2022 Subpoenas—only made in bad faith and also duplicative and cumulative of prior subpoenas—must be rejected.

Additionally, the SEC's conduct and filing of this subpoena enforcement proceeding is clearly indicative of bad faith and improper motives. For example, the SEC issued a press release for this matter disclosing confidential, non-public information. Further, the SEC has contacted multiple Fund clients or entities with which the Fund has business relationships to ask questions and potentially disclose confidential information about the investigation.

Accordingly, the SEC's unjustified further inquiry of the Fund and Respondents must be put to an end, and the Order to Show Cause must be denied.

## FACTUAL BACKGROUND

As set forth more fully in the accompanying Declaration of Ernest Edward Badway, dated September 12, 2022 ("Badway Decl."), this subpoena enforcement proceeding is the culmination of a two-year exhaustive inquiry that has produced no evidence of wrongdoing.

### A.      September 2020 to March 2022: The Original Staff Inquiry

The origins of this matter date back to January 31, 2020, when the SEC issued an Order Directing Private Investigation and Designating Officers to Take Testimony ("Formal Order").

Badway Decl., ¶ 12.  The SEC's Formal Order related to its baseless belief that the Fund had
engaged in potential violations of securities laws, including defrauding or misleading potential
investors in the Fund.  Badway Decl., ¶ 13.  As detailed in the Badway Decl., since the issuance
of the Formal Order, the Fund and Respondents have engaged in tireless efforts to dutifully and
promptly comply with each and every one of the SEC's requests, spending substantial time and
significant money in doing so.  Badway Decl., ¶ 14.

On September 24, 2020, eight months after issuance of the Formal Order, the SEC issued
a subpoena to the Fund requesting production of sixteen separate, but broad, categories of
documents spanning a four-plus year time period ("September 2020 Fund Subpoena").  Badway
Decl., ¶ 15; Exhibit 7 to Declaration of Christopher M. Castano ("Castano"), dated September 1,
2022 ("Castano Decl.") [DN 6-9].  What followed was months of effort by the Fund and its
principals to diligently comply with all of the Staff's requests.  Between November 2020 and
August 2021[1], the Fund and its principals (1) produced hundreds of thousands of documents
spanning more than 800,000 pages, (2) provided multiple letter memorandums to the SEC
providing specific information and disclosures to questions posed, (3) sat for testimony, and (4)
engaged in multiple email correspondence and telephone conversations with the Staff.  Badway
Decl., ¶¶ 16-29.  Over the course of this time period, the SEC Staff continually indicated that its
inquiry was about *valuations*.  Badway Decl., ¶ 30.  In fact, as late as December 2021,
Christopher Castano ("Castano") and Christopher Mele ("Mele") indicated in a phone call to

---

[1] On June 25, 2021, the SEC issued a second subpoena, this time to Mr. Cronin, a respondent
here ("June 2021 Cronin Subpoena").  The June 2021 Cronin Subpoena was identical to the
substance of the September 2020 Fund Subpoena.  Badway Decl., ¶ 23.  Then, on July 19, 2021,
the SEC issued a second subpoena to the Fund ("July 2021 Fund Subpoena"**),** also identical to
the September 2020 Fund Subpoena but with an expanded time period.  Badway Decl., ¶ 27.

Respondents' counsel that the Staff was seeking information regarding *valuations* - and that this was the focus of their inquiry.  Badway Decl., ¶ 30.

B.      **March 2022: The Staff's Desperate Shift in Inquiry Focus**

On March 11, 2022, Respondents' counsel received a phone call from SEC Staff (Stephen Rawlings and Chris Castano), wherein the Staff—for the first time ever—lodged accusations against the Fund regarding its purported failure to disclose the SEC inquiry in certain private due diligence questionnaires ("Due Diligence Questionnaires").[2]  Badway Decl., ¶ 33. At *no other time* prior to this March 11, 2022 phone call from the SEC Staff did anyone at SEC express any issues related to disclosure of the inquiry.[3]  Badway Decl., ¶ 34.  So, the SEC Staff's sudden phone call in March 2022, after having possessed these documents for no less than seven months, was curious.  Badway Decl., ¶ 38.  This is especially so since respondent Curt Cronin also informed SEC in his July 8, 2021 testimony that he had not informed or discussed with anyone the SEC's inquiry.  *Id*.  It was clear that this newly raised issue was nothing more than an attempt to delay closing an inquiry about *valuation*, since the Staff was unable to find any evidence of wrongdoing in this regard.  Badway Decl., ¶ 39.

---

[2] The SEC has annexed these Due Diligence Questionnaires to the Castano Decl., despite every production of documents to the SEC being noted as confidential.  Badway Decl., ¶ 33, n.3; Exhibit 2 to Castano Decl. [DN 6-2 to 6-4]; Exhibit 14 to Castano Decl. [DN 7-4 to 7-6].  This is not to mention that SEC also annexed other documents produced confidentially by the Fund to the Castano Decl., and posting it to the docket publicly.  *See, e.g.*, Exhibit 6 to Castano Decl. [DN 6-8].

This is yet another indicia of the SEC's bad faith in this entire matter.

[3] Footnote 6 of Castano's Decl. – that the Staff expressed concerns regarding disclosure beginning in November 2021 – is false.  Curiously, Mr. Castano says they expressed concerns beginning in November 2021, but then only refers to correspondence in March 2022.  Badway Decl., ¶ 35.

Respondents' counsel asked the Staff to refer him to Commission pronouncements and caselaw supporting their position that the Fund was required to disclose this confidential, non-public inquiry in the Due Diligence Questionnaires.  Badway Decl., ¶¶ 40-41.  The Staff failed to do so.  Badway Decl., ¶ 40.  Ultimately, the Staff provided reference to two cases – *In the Matter of ZPR Investment Mgmt., Inc. et al.*, Admin. Proc. File No. 3-15263, Release No. 4249 (Oct. 30, 2015) and *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 727-28 (S.D.N.Y. 2015).  Badway Decl., ¶ 42.

As set forth more fully below, neither of these cases had any relevance or import to the obligation to disclose this confidential, non-public inquiry on the Due Diligence Questionnaires. Badway Decl., ¶ 42.  Consequently, on March 24, 2022, Respondents' counsel wrote a letter to Gurbir Grewal, Esq., the Director of Enforcement, detailing the Staff's abuses, as well as the recklessness of their inquiry – which was suddenly now solely focused on a disclosure issue. Badway Decl., ¶ 43.  In this correspondence, Respondents' counsel set forth, in detail, the lack of factual and legal bases for SEC to allege that the Fund failed to disclose anything.  *Id.*; Exhibit 18 to the Castano Decl. [DN 7-10].

The Enforcement Director never responded to the March 24, 2022 letter.  Instead, the Staff's harassment continued with *more* subpoenas.  Badway Decl., ¶ 45.

C.    **The July 2022 Subpoenas**

On April 1, 2022, the Commission served further subpoenas—this time with a *second* subpoena upon respondents Curt Cronin ("April 2022 Cronin Subpoena") and a first subpoena upon John Joseph ("April 2022 Joseph Subpoena").  Badway Decl., ¶ 47; Exhibits 15 and 16 to

the Castano Declaration [DN 7-7 and 7-8].[4]  Given that disclosure was the new purported basis

for the SEC's continued inquiry of the Fund, Respondents' counsel asked Mr. Rawlings "is the

SEC Staff specifically directing that Mr. Cronin and Mr. Joseph make specific disclosures to

investors concerning these SEC subpoenas?"  Badway Decl., ¶ 48; Exhibit 19 to Castano Decl.

[DN 7-11].

    Mr. Rawlings incredulously responded, "the staff does not, and is not, providing any

legal advice or direction as to disclosures."  Badway Decl., ¶ 49.  In other words, the Staff

refused to provide any "legal advice or direction as to disclosures," while simultaneously

attempting to argue that the Fund violated securities laws on this same basis.  Badway Decl., ¶

50.

    During this time, in April 2022, the Fund became aware that the Staff was contacting

multiple Fund clients to ask them questions.  Badway Decl., ¶ 51.  This amounted to *de facto*

disclosure to the Fund's clients of the SEC's Staff's inquiry– yet another example of the Staff's

continued harassment and disruption of the Fund's business.  *Id*.  Further, during April and May

2022, SEC was issuing multiple other subpoenas to other companies that have engaged with the

Fund.  *Id*.

    On June 15, 2022, after further correspondence from Mr. Rawlings and Mr. Castano

regarding the April 2022 Cronin Subpoena and April 2022 Joseph Subpoena, Respondents'

counsel wrote to Mr. Rawlings, explaining as follows:

---

[4] Prior to them serving these April 2022 Subpoenas, Respondent's counsel already informed the
Staff that Mr. Cronin "has already answered all of the questions related to his knowledge
concerning the SEC subpoena and any disclosure. This seems like harassment," and even offered
to answer written questions.  Badway Decl., ¶ 47, n.4; Exhibit 17 to Castano Decl. [DN 7-9].

We received your correspondence and phone call.  Given the Staff's conduct, my clients have determined that we will not be providing any further information to the Staff at this time.

Despite the questionable origins of this inquiry, my clients provided the Staff with nearly 400,000 documents, detailed summaries of business practices, customer documentation, and extensive financial records, including, but not limited to, its proprietary historical database, to name just a few items.  One of my clients also sat for an all-day SEC testimony where he was repeatedly asked the same questions, but provided answers to everything.  Nonetheless, despite all of these significant and substantial cooperative measures, it has become quite apparent the Staff pre-judged this matter, and was merely looking for an angle to charge my clients.

For example, in December 2021, Chris Castano informed us that the Staff was solely looking at the valuation question concerning the fund.  Later, in February 2022, the Staff abruptly shifted its focus to a disclosure issue concerning the Staff's inquiry.  The Staff knew my clients made no disclosure of the SEC's inquiry because there is absolutely no legal requirement to do so.  Moreover, the legal support for this axiomatic position was directly provided to the Enforcement Director.  Further, indicating the contrived nature of the inquiry and bad faith of the Staff is the uncontroverted fact the Staff was aware there was no disclosure of this inquiry as early as July 2021.  At that time, my client's testimony and the subsequent document production both confirmed no investors were told about the Staff's inquiry since there is no legal obligation to do so.  The thought propounded by the Staff that somehow its knowledge of this issue was "novel" in February 2022 is simply not supportable.

In the meantime, the Staff has continually harassed my clients' investors and their vendors with subpoenas and interviews where subjective questions have been asked having no relevance to any purported serious inquiry.  Moreover, when we directly asked the Staff if your subpoenas needed to be disclosed, you refused to say if they did.  Such a response is the ultimate in bad faith especially given the position the Staff is now taking.

Consequently, since the Staff is engaging in these tactics, we are under no obligation to proceed with further responses to the Staff's inquiries.  That means, my clients will not attend a further testimony, and, if the Staff seeks to compel them, my clients will assert all their available rights.  Moreover, my clients intend on vigorously defending any subsequent enforcement action (since the Staff has already made up its mind on recommending said action).

Badway Decl., ¶ 53; Exhibit 20 to Castano Decl. [DN 7-12].  Mr. Rawlings responded that they

would proceed to open the record on the dates and times provided, and "we reserve all our rights

to compel compliance with the subpoenas or take other actions in furtherance of our investigation."  Badway Decl., ¶ 54; Exhibit 20 to Castano Decl. [DN 7-12].

On July 13, 2022, the SEC sent another letter again requesting that Mr. Cronin and Mr. Joseph appear for testimony.  Badway Decl., ¶ 55; Exhibit 24 to Castano Decl. [DN 8-4]. Thereafter, on July 18, 2022, the SEC reissued the April 2022 Cronin Subpoena and April 2022 Joseph Subpoena ("July 2022 Cronin Subpoena" and "July 2022 Joseph Subpoena," collectively the "July 2022 Subpoenas").  Badway Decl., ¶ 56; Exhibits 26 and 27 to Castano Declaration [DN 8-6 to 8-7].  As made clear in the chart set forth at paragraph 57 of the Badway Decl., the July 2022 Cronin Subpoena and the July 2022 Joseph Subpoena were literally **identical** in substance to the September 2020 Fund Subpoena, July 2021 Fund Subpoena, and June 2021 Cronin Subpoena – except that SEC added the words "and due diligence questionnaires" to request number 2 (even though the Due Diligence Questionnaires were obviously already produced, given that they are what purportedly prompted this new escapade by the Staff). Badway Decl., ¶ 57.

Displeased that Respondents were unwilling to fold to the Staff's continued abuses, harassment and bad faith, the SEC filed this action to enforce the harassing and duplicative July 2022 Subpoenas.

## LEGAL ARGUMENT

## POINT I.

## STANDARD OF REVIEW

"To win judicial enforcement of an administrative subpoena, the SEC 'must show [1] that the investigation will be conducted pursuant to a legitimate purpose, [2] that the inquiry may be relevant to the purpose, [3] that the information sought is not already within the Commissioner's

possession, and [4] that the administrative steps required . . . have been followed . . ..'" *RNR Enterprises, Inc. v. S.E.C.*, 122 F.3d 93, 96 (2d Cir. 1997) (citing *United States v. Powell*, 379 U.S. 48, 57-58 (1964)).  "The respondent opposing enforcement must shoulder the burden of showing that the subpoena is unreasonable or was issued in bad faith or for an improper purpose, or that compliance would be unnecessarily burdensome." *Id.* at 97 (internal quotations omitted).

While Respondents "shoulder the burden" of resisting enforcement of the SEC's July 2022 Subpoenas, it is accepted that "a governmental investigation into corporate matters may be of such a sweeping nature and so unrelated to the matter properly under inquiry as to exceed the investigatory power."  *United States v. Morton Salt Co.*, 338 U.S. 632, 652 (1950) (quoted in *In re McVane*, 44 F.3d 1127, 1135 (2d Cir. 1995)).

"[I]f a subpoena were not issued in good faith but to harass or pressure the subject of an investigation, or for any other improper purpose, then the court would be bound not to enforce the subpoena as issued." *Sec. & Exch. Comm'n v. Brigadoon Scotch Distrib. Co.*, 480 F.2d 1047, 1056 (2d Cir. 1973).

The SEC has failed to demonstrate at least three of the above-referenced steps, that is, there is no legitimate purpose to this inquiry, it has no relevance to any legitimate inquiry, and the Commission already possesses the information.  Accordingly, the Order to Show Cause should be denied.

## POINT II.

### THE SUBPOENAS ARE UNREASONABLE, IN BAD FAITH AND FOR AN IMPROPER PURPOSE

The July 2022 Subpoenas should not be enforced, as they were issued in bad faith, for an improper purpose, and are unreasonable on their face.

10

Namely, these July 2022 Subpoenas are obviously nothing more than an excuse to evade closing a lengthy and expensive inquiry about purported wrongdoing that led to no evidence of wrongdoing.  The July 2022 Subpoenas are literally *identical* to subpoenas from nearly two years prior as well as the others previously served, where full responses had been submitted to the SEC's Staff by the Fund and its Principals.  Unfortunately for the SEC, there is no legal or factual basis for the Fund or its principals to have disclosed the SEC matter, and, therefore, the July 2022 Subpoenas are in bad faith and for in improper purpose.

> **A.     The Staff Has Known Since July 2021 That the SEC Matter Was Not Disclosed and Is Serving the July 2022 Subpoenas to Extend What Should Be a Closed Inquiry**

The timing of this new "issue" raised by the Staff is curious. The SEC admits it was in possession of the Due Diligence Questionnaires since, at the very latest, August 20, 2021.  *See* Castano Decl., ¶ 16 [DN 6].   Now, the Staff raised the "disclosure" issue in these Due Diligence Questionnaires in March 2022, after having possessed these documents for—at a minimum—*seven months*.  Badway Decl., ¶ 38.  Moreover, the Staff was keenly aware that this inquiry was not disclosed to investors, as Cronin told the Staff on July 8, 2021— *now over a year ago*—that BSRF had not informed anyone of the SEC investigation.  *Id.*

The Staff had no justification in March 2022—and has no justification now—to complain about something and serve duplicative subpoenas when SEC very well knew all along that this confidential, non-public was not being disclosed.  Simply stated, if the Staff truly believed that the Fund made misrepresentations, it should have objected back in July 2021.  This leads to only one conclusion; the Staff's new position—the failure to disclose the confidential, non-public inquiry—is nothing more than an attempt to delay the closing of this inquiry since they were unable to find any violations concerning the valuation of the Fund.

For this reason alone, the SEC's Order to Show Cause should be denied.

11

**B.      The Due Diligence Questionnaires Did Not Inquire As to an SEC Inquiry**

Another reason these July 2022 Subpoenas are in bad faith and for an improper purpose is because the Due Diligence Questionnaire did not specifically inquire as to a confidential, non-public SEC inquiry. The Due Diligence Questionnaire clearly defines the "Firm" as ***Ridgeline Productions LLC***, and separately defines the "Fund" as ***Broadway Strategic Return Fund, LP***. *See* Exhibit 14 to Castano Decl., p. 3 of 12 [DN 7-4].  The Section of the Due Diligence Questionnaire at issue is Section 12, that sets forth very specific questions regarding the *Firm* (that is, Ridgeline Productions LLC) – not the Fund.  *See* Exhibit 14 to Castano Decl., p. 9 of 22 [DN 7-6].  The specific Questions 12.1, 12.2, and 12.3 all relate to the Firm.  *Id.*  There is no question that there was no pending litigation or investigation against the Firm (or the Fund). Therefore, the Due Diligence Questionnaire was completed accurately and truthfully.

For this additional reason, the July 2022 Subpoenas are a fruitless endeavor made in bad faith and the SEC's Order to Show Cause should be denied.

**C.      SEC Matters Need Not Be Disclosed**

Perhaps most telling of the SEC's bad faith in its actions and issuance of the July 2022 Subpoenas is that the Staff's own Enforcement Manual and the various cases and literature discussing the nature of an SEC "investigation" post-Formal Order.  These sources confirm there was no obligation for this matter to have been disclosed based upon prevailing law and decades of Commission practice (even assuming the Due Diligence Questionnaires asked if there was an SEC Investigation against the Fund).

The SEC's Enforcement Manual, at Section 3.3.2, dictates that there are no "targets" of any investigation:

> Unlike the grand jury process in which targets of an investigation are often identified, the SEC investigative process does not have targets. Thus, the SEC is not required to provide any type of target notification when it issues subpoenas to third parties or

12

witnesses for testimony or documents in its nonpublic investigations of possible violations of the federal securities laws. The Supreme Court, in *SEC v. O'Brien*, 467 U.S. 735, 750 (1984), noted that ""the imposition of a notice requirement on the SEC would substantially increase the ability of persons who have something to hide to impede legitimate investigations by the Commission." Citing the SEC's broad investigatory responsibility under the federal securities laws, the Court found no statutory, due process, or other standard regarding judicial enforcement of such subpoenas to support the proposition that notice is required.

Although some parties involved in investigations eventually may be named as defendants or respondents in subsequent litigation, the SEC does not have targets of its inquiries or investigations.

The SEC Enforcement Manual reiterates the simple fact, reinforced by decades of Commission practice, that SEC investigations do not have any targets, so this "investigation" cannot be deemed to be "against" anyone or any entity in particular. *See also, Wells v. S.E.C.*, 113 F.3d 1230, *2 (S.D.N.Y 1997) ("The statute and regulations do not preclude an investigation of an entire industry . . . Nor do they require that a specific 'target' of an investigation-that is, a company or person suspected of violating securities laws-be named in an order authorizing an investigation, or that the scope of the investigation be limited to companies existing before the order was issued . . . The SEC often undertakes investigations into suspicious securities transactions without any knowledge of which of the parties involved may have violated the law.") (internal quotations omitted).

Moreover, as acknowledged in the Staff's cover letter accompanying each and every one of the subpoenas served in this matter, the Staff acknowledged that "[t]his investigation is a non-public, fact-finding inquiry. We are trying to determine whether there have been any violations of the federal securities laws. The investigation does not mean that we have concluded that anyone has violated the law. Also, the investigation does not mean that we have a negative opinion of any person, entity or security."  [DN 6-9, 7-1, 7-2, 8-6, 8-7].

13

The breadth of cases and literature on Commission "investigations" likewise make clear that a "Formal Order" only signals the commencement of *non-public* fact-finding inquiries.  It is not a pronouncement of a formal investigation "against" any person or entity in particular that would trigger disclosure obligations on self-made private forms and questionnaires.  *See, e.g.*, *SEC Enforcement Manual*, Section 3.3.5.1 ("In authorizing the issuance of a formal order, the Commission delegates broad fact finding and investigative authority to the staff[.]"); *United States Sec. & Exch. Comm'n v. Collector's Coffee Inc.*, 337 F.R.D. 70, 76 (S.D.N.Y. 2020) ("CCI notes that the SEC characterized the investigation as a non-public fact-finding inquiry[.]'"); *Porrazzo v. United States Sec. & Exch. Comm'n*, 2018 WL 1598655, at *2 (D. Haw. Apr. 2, 2018) ("the letter accompanying the Subpoenas described SEC Matter LA-4895 as 'a non-public, fact-finding inquiry.'"); *Illinois Citizens Comm. for Broad. v. F.C.C.*, 515 F.2d 397, 400 (D.C. Cir. 1974) ("The inquiry was to be a nonpublic fact-finding proceeding[.]").

Specifically, the United States District Court for the Southern District of New York has expressly held that SEC investigations do not trigger disclosure obligations in *In re Lions Gate Entertainment Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 12 (S.D.N.Y. 2016).  In *Lions Gate*, the plaintiffs alleged that Lions Gate failed to disclose an ongoing SEC investigation into possible wrongdoing and rendered misleading statements regarding its Forms 10-K and 10-Q.  *Id.* at 10.  The United States District Court for the Southern District of New York held that the SEC investigation did *not* trigger disclosure obligations to investors.  *Id.* at 12.  The court held that that there is no general obligation under the federal securities laws to disclose to investors an ongoing SEC investigation or even the receipt of a Wells Notice and that these developments were not per se material to investors.  *Id.* at 15. In fact, the court went so far as to state that "corporations are not required to disclose a fact merely because a reasonable investor would very much like to know that fact" and that "a government

14

investigation, without more, does not trigger a generalized duty to disclose." *Id.* at 11, 12 (internal quotations omitted).

This is only one of many cases reaffirming the straightforward principle that an SEC investigation does not trigger any duty to disclose. *See Gruber v. Gilbertson*, 2018 WL 1418188, at *10 (S.D.N.Y. Mar. 20, 2018) ("[T]he fact of an SEC investigation, 'without more, does not trigger a generalized duty to disclose.'"); *In re XP Inc. Sec. Litig.*, 524 F. Supp. 3d 23, 37–38 (E.D.N.Y. 2021) ("[A] government investigation, without more, does not trigger a generalized duty to disclose . . . Nor do federal securities laws 'require a company to accuse itself of wrongdoing' . . . Accordingly, several courts have dismissed claims premised on the failure to disclose ongoing regulatory investigations.")[5]

The complete lack of legal basis for the SEC's new "disclosure" theory for its investigation is further indicia that the SEC is operating in bad faith and desperately attempting to pin non-existent wrongdoing on the Fund and its Principals—at whatever cost.

---

[5] The authority that the Staff presented to Respondents' counsel previously (*In the Matter of ZPR Investment Mgmt., Inc. et al.*, Admin. Proc. File No. 3-15263, Release No. 4249 (Oct. 30, 2015) and *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 727-28 (S.D.N.Y. 2015)) is completely irrelevant.

Regarding *In the Matter of ZPR*, at issue in that case were specific Morningstar reports (publicly available reports to investment advisers) wherein ZPRIM expressly stated that there was "no 'Pending SEC Investigation'" after "the Division of Enforcement had informed ZPRIM no later than August 16, 2010, [that the] Commission staff was 'conducting an investigation.'"  Initially, as set forth above, the Due Diligence Questionnaire questions were directed at the Firm (not the Fund), who is not even subject to the Commission's regulatory authority.  Further, unlike in *ZPR*, Due Diligence Questionnaires did not specifically inquire as to the existence of "Pending SEC Investigations."

Similarly, *In re Bioscrip* is completely distinguishable as it deals with the alleged failure to disclose in a Form 10-K a civil investigative demand ("CID") made by the United States Attorney's Office for the Southern District of New York, the U.S. Department of Justice, the Federal Bureau of Investigation, and other state and federal agencies – *after* a lawsuit had already been filed against Bioscrip alleging a violation of anti-kickback laws.

###### D.     Other Indicia of the SEC's Bad Faith and Improper Motives in this Matter

The SEC's bad faith extends beyond the mere bait-and-switch in inquiry focus, as discussed above having no legal or factual basis.

In the ultimate example of the bad faith conduct, in this very proceeding the SEC tries to convince this court they are keeping things in confidence, when, in fact, they have (1) issued a press release regarding this action, and (2) needlessly annexed multiple confidential documents of the Fund to its Declaration in support of this application.  Badway Decl., ¶ 10.

Additionally, the SEC has contacted multiple Fund clients or entities who the Fund has business relationships to ask questions and potentially disclose confidential information about the inquiry.

###### E.     The July 2022 Subpoenas Are Duplicative of the Prior Subpoenas

As if all the foregoing was not enough, the July 2022 Subpoenas also should not be enforced on a more traditional ground—they are unreasonable and wholly duplicative of prior subpoenas already served and responded to.

As made clear in the chart below, the July 2022 Cronin Subpoena and the July 2022 Joseph Subpoena were literally **identical** in substance to the September 2020 Fund Subpoena, July 2021 Fund Subpoena, and June 2021 Cronin Subpoena—except that SEC added the words "and due diligence questionnaires" to request number 2 (although the Due Diligence Questionnaires were obviously already produced, given that they are what purportedly prompted this new escapade by the Staff):

| September 2020 Fund Subpoena[6] | June 2021 Cronin Subpoena[7] | July 2022 Cronin Subpoena[8] | July 2022 Joseph Subpoena[9] |
|---|---|---|---|
| 1. All documents sufficient to identify all residential addresses, e-mail addresses, instant messaging addresses, social media handles, employment addresses and telephone numbers used by Curt Cronin, Arnold Hunter, and John Joseph. | 1. Information sufficient to identify all residential addresses, e-mail addresses, instant messaging addresses, social media handles, employment addresses and telephone numbers used by Curt Cronin. | 1. Information sufficient to identify all residential addresses, e-mail addresses, instant messaging addresses, social media handles, employment addresses and telephone numbers used by Curt Cronin. | 1. Information sufficient to identify all residential addresses, e-mail addresses, instant messaging addresses, social media handles, employment addresses and telephone numbers used by John Joseph. |
| 2. All documents and communications concerning Broadway Strategic's confidential offering memorandums, partnership agreements, limited partnership agreements, subscription agreements, financial statements, onboarding checklists, and any investor communications, | 2. All documents and communications concerning Broadway Strategic's confidential offering memorandums, partnership agreements, limited partnership agreements, subscription agreements, financial statements, onboarding checklists, and any investor communications, including, without limitation, e-mail, text messages, newsletters and valuations reports. | 2. All documents and communications concerning Broadway Strategic's confidential offering memorandums, partnership agreements, limited partnership agreements, subscription agreements, financial statements, onboarding checklists, and any investor communications, including, without | 2. All documents and communications concerning Broadway Strategic's confidential offering memorandums, partnership agreements, limited partnership agreements, subscription agreements, financial statements, onboarding checklists, and any investor communications, including, without limitation, e-mail, text messages, newsletters, valuations reports, **and due diligence questionnaires.** |

---

[6] *See* Exhibit 7 to Castano Decl. [DN 6-9].  The July 2021 Fund Subpoena was identical in substance to the September 2020 Fund Subpoena other than extending the time period.  *See* Exhibit 11 to Castano Decl. [DN 7-1].

[7] *See* Exhibit 12 to Castano Decl. [DN 7-2].

[8] *See* Exhibit 26 to Castano Decl. [DN 8-6].

[9] *See* Exhibit 27 to Castano Decl. [DN 8-7].

| | | | |
|---|---|---|---|
| including, without limitation, e-mail, text messages, newsletters and valuations reports. | | limitation, e-mail, text messages, newsletters, valuations reports, **and due diligence questionnaires.** | |
| 3. All documents and communications concerning capital raised by Broadway Strategic, including, without limitation, capital contributions. | 3. All documents and communications concerning capital raised by Broadway Strategic, including, without limitation, capital contributions. | 3. All documents and communications concerning capital raised by Broadway Strategic, including, without limitation, capital contributions. | 3. All documents and communications concerning capital raised by Broadway Strategic, including, without limitation, capital contributions. |
| 4. All documents and communications concerning distributions of capital made by Broadway Strategic, including, without limitations, investments, professional fees, capital commitments, and funds returned to investors, partners or limited partners. | 4. All documents and communications concerning distributions of capital made by Broadway Strategic, including, without limitations, investments, professional fees, capital commitments, and funds returned to investors, partners or limited partners. | 4. All documents and communications concerning distributions of capital made by Broadway Strategic, including, without limitations, investments, professional fees, capital commitments, and funds returned to investors, partners or limited partners. | 4. All documents and communications concerning distributions of capital made by Broadway Strategic, including, without limitations, investments, professional fees, capital commitments, and funds returned to investors, partners or limited partners. |
| 5. All documents and communications concerning redemptions requests, including, without limitation, paid and/or unpaid requests. | 5. All documents and communications concerning redemptions requests, including, without limitation, paid and/or unpaid requests. | 5. All documents and communications concerning redemptions requests, including, without limitation, paid and/or unpaid requests. | 5. All documents and communications concerning redemptions requests, including, without limitation, paid and/or unpaid requests. |
| 6. All documents and communications concerning all transactions between the Fund and Curt Cronin, Arnold | 6. All documents and communications concerning all transactions between the Fund and Curt Cronin, Arnold Hunter, and John Joseph. | 6. All documents and communications concerning all transactions between the Fund and Curt Cronin, Arnold | 6. All documents and communications concerning all transactions between the Fund and Curt Cronin, Arnold Hunter, and John Joseph. |

| | | | |
|---|---|---|---|
| Hunter, and John Joseph. | | Hunter, and John Joseph. | |
| 7. All documents and communications concerning Broadway Strategic's acquisition of each of the portfolio investments noted in any ValueScope Inc. valuation report, including, without limitation, forty-nine (49) portfolio investments noted in the report for in or around September 30, 2019. | 7. All documents and communications concerning Broadway Strategic's acquisition of each of the portfolio investments noted in any ValueScope Inc. valuation report, including, without limitation, forty-nine (49) portfolio investments noted in the report for in or around September 30, 2019. | 7. All documents and communications concerning Broadway Strategic's acquisition of each of the portfolio investments noted in any ValueScope Inc. valuation report, including, without limitation, forty-nine (49) portfolio investments noted in the report for in or around September 30, 2019. | 7. All documents and communications concerning Broadway Strategic's acquisition of each of the portfolio investments noted in any ValueScope Inc. valuation report, including, without limitation, forty-nine (49) portfolio investments noted in the report for in or around September 30, 2019. |
| 8. documents and communications concerning the assigned fair value (i.e. NPV of future cash flows) for each investment, including, without limitation, actual show investment, maximum required capital, expected capital required, and expected and actual total investment. | 8. All documents and communications concerning the assigned fair value (i.e. NPV of future cash flows) for each investment, including, without limitation, actual show investment, maximum required capital, expected capital required, and expected and actual total investment. | 8. All documents and communications concerning the assigned fair value (i.e. NPV of future cash flows) for each investment, including, without limitation, actual show investment, maximum required capital, expected capital required, and expected and actual total investment. | 8. All documents and communications concerning the assigned fair value (i.e. NPV of future cash flows) for each investment, including, without limitation, actual show investment, maximum required capital, expected capital required, and expected and actual total investment. |
| 9. All documents and communications concerning Broadway Strategic's general ledger, subsidiary ledgers, trial balances and journal entries. | 9. All documents and communications concerning Broadway Strategic's general ledger, subsidiary ledgers, trial balances and journal entries. | 9. All documents and communications concerning Broadway Strategic's general ledger, subsidiary ledgers, trial balances and journal entries. | 9. All documents and communications concerning Broadway Strategic's general ledger, subsidiary ledgers, trial balances and journal entries. |

| | | | |
|---|---|---|---|
| 10. All documents and communications concerning Broadway Strategic's valuation methodology, including but not limited to, projected future cash flows, discount rates and probability of success factors. | 10. All documents and communications concerning Broadway Strategic's valuation methodology, including but not limited to, projected future cash flows, discount rates and probability of success factors. | 10. All documents and communications concerning Broadway Strategic's valuation methodology, including but not limited to, projected future cash flows, discount rates and probability of success factors. | 10. All documents and communications concerning Broadway Strategic's valuation methodology, including but not limited to, projected future cash flows, discount rates and probability of success factors. |
| 11. All documents concerning Broadway Strategic's algorithm for selecting investments, including, without limitation, all representations to investors or potential investors concerning the algorithm and all documents supporting such representations. | 11. All documents concerning Broadway Strategic's algorithm for selecting investments, including, without limitation, all representations to investors or potential investors concerning the algorithm and all documents supporting such representations. | 11. All documents concerning Broadway Strategic' s algorithm for selecting investments, including, without limitation, all representations to investors or potential investors concerning the algorithm and all documents supporting such representations. | 11. All documents concerning Broadway Strategic' s algorithm for selecting investments, including, without limitation, all representations to investors or potential investors concerning the algorithm and all documents supporting such representations. |
| 12. All documents and communications concerning Broadway Strategic's calculation of management fees. | 12. All documents and communications concerning Broadway Strategic's calculation of management fees. | 12. All documents and communications concerning Broadway Strategic's calculation of management fees. | 12. All documents and communications concerning Broadway Strategic's calculation of management fees. |
| 13. All documents and communications concerning Broadway Strategic's calculation of investment returns, including, without limitation, as disclosed in footnote | 13. All documents and communications concerning Broadway Strategic's calculation of investment returns, including, without limitation, as disclosed in footnote 10 "Financial Highlights" | 13. All documents and communications concerning Broadway Strategic's calculation of investment returns, including, without limitation, as disclosed in footnote I 0 "Financial Highlights" | 13. All documents and communications concerning Broadway Strategic's calculation of investment returns, including, without limitation, as disclosed in footnote I 0 "Financial Highlights" of the Fund's audited financial statements. |

| | | | |
|---|---|---|---|
| 10 "Financial Highlights" of the Fund's audited financial statements. | of the Fund's audited financial statements. | of the Fund's audited financial statements. | |
| 14. All documents and communications concerning Broadway Strategic's investment returns (including net investment gains and losses and realized and unrealized gains and losses on investment in private companies). | 14. All documents and communications concerning Broadway Strategic's investment returns (including net investment gains and losses and realized and unrealized gains and losses on investment in private companies). | 14. All documents and communications concerning Broadway Strategic's investment returns (including net investment gains and losses and realized and unrealized gains and losses on investment in private companies). | 14. All documents and communications concerning Broadway Strategic's investment returns (including net investment gains and losses and realized and unrealized gains and losses on investment in private companies). |
| 15. All documents and communications concerning the Fund, between the Fund and any auditor or accountant, including, without limitation, Berkower LLC. | 15. All documents and communications concerning the Fund, between the Fund and any auditor or accountant, including, without limitation, Berkower LLC. | 15. All documents and communications concerning the Fund, between the Fund and any auditor or accountant, including, without limitation, Berkower LLC. | 15. All documents and communications concerning the Fund, between the Fund and any auditor or accountant, including, without limitation, Berkower LLC. |
| 16. All documents identifying any Broadway Strategic bank account, including, without limitation, any bank account held at Northbrook Bank and Trust. | 16. All documents identifying any Broadway Strategic bank account, including, without limitation, any bank account held at Northbrook Bank and Trust. | 16. All documents identifying any Broadway Strategic bank account, including, without limitation, any bank account held at Northbrook Bank and Trust. | 16. All documents identifying any Broadway Strategic bank account, including, without limitation, any bank account held at Northbrook Bank and Trust. |

Badway Decl., ¶ 57.

It is nothing less than crystal clear that the July 2022 Cronin Subpoena and July 2022 Joseph Subpoena are nearly identical mimics of the first subpoena served on the fund *nearly two years ago*.  Moreover, all of this information has already been produced.

To the single extent the July 2022 Subpoenas are at all different (*i.e.,* adding the words "and due diligence questionnaires" to request number 2), this is harassing, needless and duplicative especially given that SEC has admitted such questionnaires have been produced by the Fund (again, the SEC has now improperly filed these items to the public docket in this proceeding).  Moreover, the July 2022 Subpoenas make obvious that the only reason they were served, and that there was an additional request for testimony, is to further prod the Fund and its principals regarding the "disclosure" issue – an issue that is not new, has no merit, and facts the SEC has already questioned the Principals.  As set forth above, this "disclosure" issue has no good faith basis in fact *or* in law – and is a blatant attempt by the Staff to prolong a long inquiry that has done nothing but reveal the Fund's impeccable processes while paradoxically casting a shadow over the reputation of its upstanding officers.  We ask the court to terminate this perpetual, fruitless inquiry, and unjustifiable disruption of the Fund's business.

## <u>CONCLUSION</u>

For the foregoing reasons, Respondents request that this Court put an end to the SEC's

duplicative and unnecessary efforts to obtain information it already has and deny the Order to

Show Cause in its entirety.

Dated: New York, New York

     September 12, 2022                         Respectfully Submitted,

                                                **FOX ROTHSCHILD LLP**

                                                */s/ Ernest Edward Badway*
                                                Ernest Edward Badway, Esq.
                                                Philip Z. Langer, Esq.
                                                101 Park Avenue, 17th Floor
                                                New York, New York 10178
                                                Telephone: 212-878-7986
                                                Facsimile: 212-692-0940
                                                E-Mail:
                                                EBadway@foxrothschild.com

                                                *Attorneys for respondents Curtis*
                                                *Wayne Cronin and John Joseph*